1  Jeremy W. Faith (State Bar No. 190647)
2  *Jeremy@MarguliesFaithLaw.com*
   Monsi Morales (State Bar No. 235520)
3  *Monsi@MarguliesFaithLaw.com*
   MARGULIES FAITH LLP
4  16030 Ventura Blvd., Suite 470
   Encino, CA  91436
5  Telephone: (818) 705-2777
   Facsimile:  (818) 705-3777
6
7  Counsel for Flexogenix Group, Inc., *et al.*,
   Debtors and Debtors in Possession
8
                **UNITED STATES BANKRUPTCY COURT**
9
                **CENTRAL DISTRICT OF CALIFORNIA**
10
                      **LOS ANGELES DIVISION**
11

| | |
|---|---|
| In re | Bk. Case No.:  2:19-bk-12927-BR |
| FLEXOGENIX GROUP, INC., | Chapter: 11 |
| Debtor. | Jointly Administered With:<br>Case No.:  2:19-bk-12928-BR<br>Case No.:  2:19-bk-12929-BR |
| In re | Case No.:  2:19-bk-12930-BR<br>Case No.:  2:19-bk-12931-BR |
| WHALEN MEDICAL CORPORATION, | |
| Debtor. | |
| In re | **DEBTORS' MOTION FOR ORDER CONFIRMING THE FLEXOGENIX DEBTORS' THIRD AMENDED JOINT PLAN OF REORGANIZATION DATED MARCH 23, 2021; MEMORANDUM OF POINTS AND AUTHORITIES; DECLARATIONS OF SEAN WHALEN AND MONSI MORALES** |
| FLEXOGENIX NORTH CAROLINA, PC, | |
| Debtor. | |
| In re | |
| FLEXOGENIX GEORGIA, PC, | |
| Debtor. | |
| In re | Confirmation Hearing: |
| FLEXOGENIX OKLAHOMA, PC, | Date:   May 11, 2021<br>Time:   10:00 a.m.<br>Place:  Courtroom 1668 via Zoomgov.com |
| Debtor. | Meeting ID: 1617136367<br>Password: 123456 |
| ☒ Affects All Debtors | 255 East Temple Street |
| ☐ Affects Flexogenix Group, Inc. | Los Angeles, CA 90012 |
| ☐ Affects Whalen Medical Corporation | |
| ☐ Affects Flexogenix North Carolina, P.C. | |
| ☐ Affects Flexogenix Georgia, P.C. | |
| ☐ Affects Flexogenix Oklahoma, P.C. | |

# **TABLE OF CONTENTS**

*Page No.*

**MOTION** ............................................................................................. 1

**MEMORANDUM OF POINTS AND AUTHORITES**…………………………………...2

**I. INTRODUCTION** ........................................................................ 2

**II. STATEMENT OF FACTS** ........................................................ 3

    ***A.  Background*** ......................................................................... 3

    ***B.  Events Leading to Chapter 11 Filings*** ............................... 4

    ***C.  Chapter 11 Cases and Plan Formation*** ............................. 5

    ***D.  The Plan*** ............................................................................ 7

    ***E.  Confirmation Is In Best Interest of Estates*** ..................... 7

**III. SUMMARY OF THE PLAN** ................................................... 8

    ***A.  Secured Claims*** ................................................................ 8

    ***B.  Administrative Claims*** ..................................................... 8

    ***C.  Priority Tax Claims*** ......................................................... 8

    ***D.  Non-Tax Priority Claims*** ................................................. 9

    ***E.  Convenience Claims*** ......................................................... 9

    ***F.  General Unsecured Claims*** ............................................ 10

    ***G.  Interests in Debtors*** …………………………………………10

**IV.  REQUIREMENTS FOR PLAN CONFIRMATION ARE SATISFIED** ...................... 10

    ***A.  The Plan Complies With The Applicable Provisions of Title 11 (Section 1129(a)(1))*** .. 10

        1.  The Plan Properly Classifies Claims (Section 1122) ........................................... 11

        2.  The Plan Contains All Mandatory Provisions and Certain Permissive Provisions Set Forth in Section 1123 .................................................................. 12

            a. *Compliance With Section 1123(a) (Mandatory Plan Provisions)* ..................... 12

               i.  Section 1123(a)(1) (Designation of Classes of Claims and Interests)………..12

               ii.  Section 1123(a)(2) (Specification of Unimpaired Classes)…………………12

               iii.  Section 1123(a)(3) (Specification of Treatment of Impaired Classes)……....12

               iv.  Section 1123(a)(4) (Same Treatment for Each Member of A Class)……….. .13

               v.  Section 1123(a)(5) (Adequate Means for Implementation of Plan)………….13

               vi.  Section 1123(a)6) (Prohibition On Non-Voting Securities)………………….14

               vii.  Section 1123(a)(7) (Selection of Officers and Directors)…………………..14

            b. *Compliance With Section 1123(b) (Permissive Plan Provisions)* ............ ……..15

               i.  Section 1123(b)(1) (Impairment/Non-impairment)………………..……… 15

              ii.  Section 1123(b)(2) (Assumption/Rejection of Executory Contracts And Unexpired Leases)…………………………………………………………15

              iii.  Section 1123(b)(3) (Claims or Interests Belonging to the Estates)………….16

              iv.  Section 1123(b)(6) (Other Appropriate Provisions)………………………. 16

    ***B.  The Debtors, As The Plan Proponents, Have Complied With The Provisions Of Title 11 (Section 1129(a)(2))*** .................................................... 17

        1.  Section 1125(a) (Disclosure Regarding A Plan)……………………………… 18

        2.  Section 1125(b) (Disclosure and Solicitation Of Acceptances of A Plan)……….. 18

    ***C.  The Plan Has Been Proposed In Good Faith (Section 1129(a)(3))*** ............................... 18

i

D.    *The Plan Provides For Court Approval of Fees and Costs Paid By the Estates (Section 1129(a)(4))* .......................................................................................... 19

E.    *Identification of the Reorganized Debtors' Proposed Officers and Directors (Section 1129(a)(5))* ........................................................................................... 19

F.    *The Plan Does Not Alter Regulated Rates (Section 1129(a)(6))* ................................... 19

G.    *The Plan Satisfies The Best Interests Test (Section 1129(a)(7))* .................................. 20

H.    *Acceptance or Unimpairment (Section 1129(a)(8))* ...........................................21

I.    *Administrative and Priority Claims (Section 1129(a)(9))* ....................................21

J.    *Acceptance By One Impaired Class (Section 1129(a)(10))* ..................................22

K.    *The Plan Is Feasible (Section 1129(a)(11))* ...................................................22

L.    *Section 1930 Fees (Section 1129(a)(12))* .....................................................23

M.    *Retirees Benefits (Section 1129(a)(13))* ......................................................23

V.    **CONCLUSION** ...........................................................................24

1

## MOTION

2    Flexogenix Group, Inc. ("Flex Group"), Flexogenix Oklahoma, P.C. ("Flex OK"),

3 Flexogenix Georgia, P.C. ("Flex GA"), Flexogenix North Carolina, P.C. ("Flex NC"), and Whalen

4 Medical Corporation ("WMC," and collectively with Flex Group, Flex OK, Flex GA and Flex NC,

5 the "Debtors") hereby move (the "Motion") for an Order confirming the *Flexogenix Debtors'*

6 *Third Amended Plan Of Reorganization Dated March 23, 2021* (Dkt. No. 336, the "Plan")[1]

7 pursuant to section 1129(a) of title 11 of the United States Code (the "Bankruptcy Code").

8    In support of confirmation of the Plan, the Debtors submit this Motion, the attached

9 Memorandum of Points and Authorities and declarations of Sean Whalen (the "Whalen

10 Declaration") and Monsi Morales (the "Morales Declaration"), the concurrently-filed Notice of

11 Confirmation Hearing (Dkt. No. 338), the files and records in the above-captioned chapter 11

12 cases, and any other evidence and argument that may be presented prior to or at the hearing on

13 confirmation of the plan.

14 Dated: March 24, 2021     **MARGULIES FAITH LLP**

15

16            By: /s/ Monsi Morales

17              Monsi Morales
               Jeremy W. Faith

18              Counsel for the Debtors and Debtors in Possession

19

20

21

22

23

24

25

26

27

28

---

[1] Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to such term in the Plan.

# MEMORANDUM OF POINTS AND AUTHORITIES

## I.

## INTRODUCTION

At a hearing on March 2, 2021 (the "Disclosure Statement Hearing"), the Bankruptcy Court approved the Debtors' *Disclosure Statement Describing Flexogenix Debtors' Second Amended Plan of Reorganization Dated January 19, 2021*, in substantially the same form as filed, as containing adequate information for the solicitation of votes with respect to the Plan.  In accordance with the Court's ruling at the Disclosure Statement Hearing, on March 23, 2021, the Debtors filed the Plan and the *Disclosure Statement Describing Flexogenix Debtors' Third Amended Plan of Reorganization Dated March 23, 2021* (the "Disclosure Statement") and served (a) the Disclosure Statement, (b) the Plan, (c) appropriate balloting materials and (d) a notice (the "Confirmation Notice") of the confirmation hearing (the "Confirmation Hearing") on the Plan on all creditors entitled to vote in accordance with the solicitation procedures approved by the Court.  In addition, on March 23, 2021, the Debtors served the Confirmation Notice on all creditors, equity interest holders and other parties in interest in these jointly administered chapter 11 cases (the "Chapter 11 Cases").

At the Disclosure Statement Hearing, the Court instructed that completed ballots are required to be returned to counsel for the Debtors by April 13, 2021, at 5:00 p.m.  Similarly, any party wishing to object to confirmation of the Plan must file and serve a written objection no later than April 13, 2021.  On or before April 20, 2021, the Debtors will submit their ballot analysis (the "Ballot Analysis"), in which the results of the Plan voting will be tabulated and verified, and a written reply to objections to confirmation, if any.

With respect to voting, the Class of Secured Claims (Class 1) and the Class of Non-Tax Priority Claims (Class 2) are unimpaired and deemed to accept the Plan because the Plan provides that each holder of a Claim in such Class will receive value equal to the amount of such Claim or because the Plan provides that such Claims are Reinstated as of the Effective Date, and the holders of such Claims shall retain their rights and liens, if any, with respect to their Claim following the Effective Date.  Similarly, Class 5, comprised of holders of equity Interests in the Debtors, is

1  deemed to have accepted the Plan because the Plan provides that such Interests in the Debtors shall

2  be Reinstated.  Classes 3 and 4, comprised of Holders of Convenience Claims and General

3  Unsecured Claims, respectively, are impaired and entitled to vote to accept or reject the Plan.

4       This Memorandum and the supporting declarations demonstrate that each of the applicable

5  requirements of Sections[2] 1122, 1123(a) and 1129 has been satisfied, present a comprehensive

6  analysis of the issues before the Court and evidence solid grounds for confirmation of the Plan.

7  Accordingly, the Debtors respectfully request that the Plan be confirmed.

8                                             **II.**

9                              **STATEMENT OF FACTS**

10      **A.    Background**

11      Flex Group is a California corporation that was founded in or about January 2015.

12  Pursuant to pre-petition management agreements between Flex Group and the PC Debtors

13  (defined below), Flex Group provides management services to the PC Debtors.

14      Flex NC is a North Carolina professional corporation that was founded in or about June

15  2015.  Flex NC owns and operates three nonsurgical orthopedic joint care clinics in North

16  Carolina.  Flex OK is an Oklahoma professional corporation that was founded in or about March

17  2018.  Flex OK owns and operates a nonsurgical orthopedic joint care clinic in Oklahoma City,

18  Oklahoma.  Flex GA is a Georgia professional corporation that was founded in or about January

19  2017.  Prior to the Petition Date, Flex GA owned and operated a nonsurgical orthopedic joint care

20  clinic in Atlanta, Georgia.  Flex GA closed its Atlanta clinic and ceased all business operations

21  after the commencement of these Chapter 11 Cases.

22      WMC is a California corporation that was founded in or about April 2013 as Flexogenix,

23  Inc.  In or about January 2015, the company changed its name to Mogannam & Whalen Medical

24  Corporation, and in or about June 2017, the company changed its name again to Whalen Medical

25  Corporation.  Prior to the Petition Date, WMC owned and operated a nonsurgical orthopedic joint

26  care clinic in Los Angeles, California, under the name "Flexogenix Los Angeles."  WMC closed its

27  _____

28  [2] The capitalized term "Section," as used hereinafter, shall refer to the indicated section of title 11
of the United States Code (e.g., Section 1129 shall be read to refer to 11 U.S.C. § 1129).

1  Los Angeles clinic and ceased all business operations after the commencement of these Chapter 11

2  Cases.

3  **B.    Events Leading To Chapter 11 Filings**

4          In 2017-2018, the Debtors began experiencing cash flow issues stemming from decreased

5  collections and expenses arising from certain struggling clinics, principally those located in Los

6  Angeles and Atlanta, as well as increasing start-up costs and expenses for new locations such as

7  Oklahoma City, Oklahoma.  Around the same time, the Debtors abruptly separated from their

8  closely-tied advertising partner, which was responsible for all Flexogenix brand advertising, due to

9  conflicts of interest that had arisen and the advertising company's relationships with and treatment

10 of the Debtors' competitors.  This sudden loss of all advertising caused a significant and

11 unexpected decrease in the Debtors' business, as the Debtors were forced to rebuild their

12 significant advertising efforts from the ground up on their own, while running the businesses.

13         To stabilize their revenue and support necessary expenses, beginning in or about November

14 2017 and continuing through February 2019, certain of the Debtors obtained financing from several

15 above-market lenders.  During this period, the Debtors borrowed a total of approximately $11.1

16 million from ten separate lenders (the "Lenders").  All of the funds received were used to pay the

17 obligations of the Debtors, including, but not limited to, employee salaries, vendor payments, rent

18 for the clinics.

19         The Debtors were able to make significant payments to the Lenders pre-petition.

20 Specifically, with respect to the agreements that were paid in full prior to the Petition Date, the

21 Debtors borrowed $3.9 million and repaid in excess of $5.5 million.  For the agreements that

22 remained open as of the Petition, the Debtors borrowed a total of $7.2 million and have paid back

23 nearly $3.4 million.

24         Despite these substantial payments, and due to the exorbitant interest charged by the

25 Lenders, as of the Petition Date, the Debtors purportedly owed approximately $6.4 million to six of

26 the Lenders.  The Lenders are merchant cash advance ("MCA") companies.  Each of the Lenders'

27 agreements purported to grant the Lender a security interest in certain of the Debtors' accounts

28 receivable and personal property.  Less than half of the Lenders took any action to perfect their

4

Case 2:19-bk-12927-BR    Doc 343    Filed 03/24/21    Entered 03/24/21 16:28:29    Desc
Main Document    Page 8 of 39

alleged security interests, and most, if not all, of the filings that do purport to perfect a Lender's alleged security interest are objectionable and avoidable as preferential and/or fraudulent transfers.

Four of the Lenders filed proofs of claim in the Chapter 11 Cases, asserting secured claims totaling approximately $1 million and unsecured claims totaling approximately $5.3 million. The Debtors dispute the claims of the Lenders and have commenced adversary proceedings in the Bankruptcy Court against the Lenders for avoidance of fraudulent and/or preferential transfer, recovery of property transferred and, where applicable, disallowance of claim.

As MCA companies asserting security interests in certain of the Debtors' accounts receivable, the Lenders' agreements provided for daily draws by the Lenders from the Debtors' bank accounts to pay down the loans, in excess of $73,000 per day in total as of the Petition Date. The substantial and burdensome daily withdrawals, combined with ordinary and necessary business expenses, began exceeding the Debtors' revenue collections and, without availability of additional capital or financing, the Debtors decided to commence these chapter 11 cases with the goal of restructuring their debt and reorganizing as an on-going business.

**C.    Chapter 11 Cases and Plan Formation**

On March 18, 2019 (the "Petition Date"), the Debtors filed their voluntary petitions in the Bankruptcy Court, commencing the Chapter 11 Cases. On March 19, 2021, the Bankruptcy Court entered its Orders authorizing the joint administration of the Chapter 11 Cases. No creditors' committee was appointed in the Chapter 11 Cases.

To fix the problems that led to the bankruptcy filing and achieve a successful reorganization, the Debtors worked to improve the efficiency and reduce the costs of their business operations over the course of the Chapter 11 Cases. The Debtors developed and have maintained ongoing directives for the clinics designed to control labor expenses and inventory costs. In addition to implementing changes at the operations level, the Debtors also terminated certain burdensome leases and contracts. Finally, because they were not operating profitably, Flex GA and WMC ceased their business operations at the outset of these Chapter 11 Cases. The Debtors commenced these Chapter 11 Cases with the goals of reducing the Debtors' operations to only

1  those clinics that are operating profitably and eliminating burdensome leases and contracts, which

2  actions would allow the Debtors to reorganize successfully.

3      During the Chapter 11 Cases, the Debtors analyzed their businesses to determine the best

4  manner to exit bankruptcy and continue their businesses successfully.  That analysis included a

5  thorough consideration of the corporate structure and management of the Debtors, as well as

6  review and application of applicable corporate and health care laws and guidelines.  In this respect,

7  the Debtors sought and obtained strategic and specialized advice from their special health care

8  counsel, Nelson Hardiman.

9      With respect to exit strategy, the Debtors explored potential post-petition financing

10 arrangements with various entities, which arrangements included DIP financing loan facilities, exit

11 financing and/or possible equity arrangements.  In addition, the Debtors successfully negotiated

12 settlements with certain creditors holding administrative claims, thereby reducing the amount of

13 Cash needed on the Effective Date and further supporting the Plan's feasibility.

14     Finally, after initially preparing and considering separate plans for each Debtor, the Debtors

15 ultimately determined that a single consolidated plan of reorganization is appropriate and in the

16 best interests of all creditors.  While each of the Debtors maintains separate books and records and

17 the Debtors can trace funds into and out of each of the Debtors, in many cases it is very difficult

18 for the Debtors to identify the specific Debtor that is liable on a Claim. The Debtors have

19 historically been, and presently continue to be, effectively operated as a single enterprise and

20 creditors have traditionally treated the Debtors as a single enterprise.  If the Debtors were required

21 to review each Claim to determine which Debtor was liable for the Claim and which Debtor was

22 not liable for the Claim (and then resolve any disputes as to the determination of which Debtor is

23 liable), the costs to the Estates would far outweigh any benefit to the Estates and Holders of the

24 Claims.

25     On March 23, 2021, the Debtors filed and served their Plan, the Disclosure Statement and

26 the Confirmation Notice.  The Confirmation Hearing is scheduled for May 11, 2021.

27 //

28 //

6

### D.    The Plan

As of the Petition Date, the Debtors estimate that they owe approximately $1 million in Priority Tax Claims, placed in Class 2, and approximately $4,767,105.33 in Allowed General Unsecured Claims, placed in Class 4.  The Plan provides that holders of Priority Tax Claims will receive a *Pro Rata* share of $28,725.94 per month, beginning on the Effective Date and continuing for a total of 35 months.  Once the Priority Tax Claims are paid in full, the Plan provides that holders of Allowed General Unsecured Claims will receive a *Pro Rata* share of $88,000 per month for a total of 48 months.  After the 48 months of payments, the holders of Allowed General Unsecured Claims will have received approximately 30% of the amount of their claims.  Under the Plan, on the Effective Date, the Debtors will pay the allowed Administrative Expense Claims and Allowed Convenience Claims, placed in Class 3, estimated at $501,963 and $17,640, respectively. Holders of Allowed Secured Claims, placed in Class 1, if any, will have their claims Reinstated. Similarly, holders of Interests in the Debtors, placed in Class 5, also will have their interests Reinstated.

Based on the Plan treatment described above, Claims in Class 1 and Class 2, and Interests in Class 5, are unimpaired and deemed to have accepted the Plan.  Thus, holders of Claims or Interests in Classes 1, 2 and 5 are not entitled to vote on the Plan.  Claims in Class 3 and Class 4 are impaired, and holders of such Claims are entitled to vote on the Plan.

### E.    Confirmation Is In Best Interest Of The Estates

The Debtors would be unable to provide the distributions and benefits offered to the Creditors and Interest Holders under the Plan without the significant compromises reached and restructuring of debt in these Chapter 11 Cases, as proposed in the Plan.  If the Plan is not confirmed, therefore, the Debtors believe that liquidation of the estates under chapter 7 is likely the only alternative, in which case some or all of the compromises achieved in the Chapter 11 Cases may be lost, a chapter 7 trustee would be forced to sell the Debtors' assets, likely at liquidation value, the Debtors' businesses would be shut down, eliminating the potential for future revenue providing Cash for payment to creditors over time, and creditors of the estates would face significant delay in payment on their Claims while the assets are liquidated by a chapter 7 trustee.

7

1  For these reasons, immediate confirmation of the Plan is in the best interests of the estates, the

2  creditors and the Debtors.

3                                            **III.**

4                             **SUMMARY OF THE PLAN**

5          The Plan proposes that the Debtors will make distributions to all creditors holding allowed

6  claims over a period of approximately seven and one-half years following the Effective Date.

7  Specifically, the Plan's treatment of Claims and Interests is as follows:

8  **A.**     Secured Claims

9          Secured Claims are Claims secured by liens on property of the Estates.  Secured Claims are

10  classified in Class 1 under the Plan.  Class 1 Claims, if any, will be Reinstated on the Effective

11  Date, as set forth in the Plan.  The Debtors dispute that there are any valid, perfected and

12  enforceable Secured Claims.

13  **B.**     Administrative Claims

14          Administrative Claims are Claims held by creditors that provided goods and services to the

15  Debtors during the Chapter 11 Cases (such as vendors, landlords, and professionals).  Many such

16  Administrative Claims have been paid in the ordinary course of business. Under the Plan, on or

17  soon as reasonably practicable after the Effective Date, or on the date on which an Administrative

18  Claim becomes Allowed or otherwise payable under any agreement related to such Administrative

19  Claim, each holder of an Allowed Administrative Claim shall receive Cash equal to the unpaid

20  portion of such Allowed Administrative Claim.  Alternatively, an Allowed Administrative Claim

21  may be paid according to such other terms as may be agreed between the Debtors and the Holder of

22  such Administrative Claim.

23  **C.**     Priority Tax Claims

24          Priority Tax Claims are Claims consisting of certain unsecured income, employment and

25  other taxes described by section 507(a)(8).  Such Claims are entitled to priority treatment as

26  described in the Bankruptcy Code.  Pursuant to the Plan, on the later of the Effective Date or the

27  date on which a Priority Tax Claim becomes an Allowed Priority Tax Claim, each Holder of an

28  Allowed Priority Tax Claim shall receive (i) Cash equal to the unpaid portion of such Holder's

Allowed Priority Tax Claim, (ii) a *Pro Rata* share of $28,725.94 per month, which amount is subject to adjustment in accordance with 26 U.S.C. § 6621, beginning on the Effective Date and continuing for thirty-five (35) months, or until such Allowed Priority Tax Claim is paid in full, which shall occur not later than five years from the Petition Date, or (iii) such other treatment as to which the Debtors or the Reorganized Debtors and such Holder shall have agreed upon in writing. In addition, the IRS priority claim will be paid with interest per 11 U.S.C. § 511(b), and *see* 26 U.S.C. § 6621, currently 5%.

**D.**     Non-Tax Priority Claims

Non-Tax Priority Claims are Claims, other than Administrative Claims or Priority Tax Claims, that are entitled to priority in payment pursuant to section 507(a).  Non-Tax Priority Claims have been placed in Class 2.  The Plan provides that, on the latest of (a) the Effective Date, (b) the date on which such Non-Tax Priority Claim becomes an Allowed Non-Tax Priority Claim, (c) the date on which such Allowed Non-Tax Priority Claim is otherwise due and payable, and (d) such other date as mutually may be agreed to by and between the Debtors and the Holder of such Non-Tax Priority Claim, each Holder of an Allowed Non-Tax Priority Claim shall receive, in full and final satisfaction, release, and discharge of, and in exchange for, such Allowed Non-Tax Priority Claim, Cash equal to the unpaid portion of such Allowed Non-Tax Priority Claim.  No Non-Tax Priority Claims have been filed against the Debtors.

**E.**     Convenience Claims

All Convenience Claims against the Debtors are placed in Class 3.  A Convenience Claim is a Claim against the Debtors that is for $1,000 or less or the Holder of a Claim for more than $1,000 that elects to reduce its Claim to $1,000.  Under the Plan, Holders of Convenience Claims will be paid in Cash, in full, on, or as soon as reasonably practicable after, the latest of (a) the Effective Date, (b) the date on which such Convenience Claim becomes an Allowed Convenience Claim, (c) the date on which such Convenience Claim is otherwise due and payable, and (d) such other date as mutually may be agreed to by and between such Holder and the Debtors or Reorganized Debtors.  No interest will be paid on Allowed Convenience Claims.  The Debtors

1 estimate that approximately $17,640 will be paid on the Effective Date to Holders of Convenience

2 Claims.

3 **F.**      General Unsecured Claims

4      All General Unsecured Claims against the Debtors are placed in Class 4.  A General

5 Unsecured Claim is a Claim against the Debtors that is not an Administrative Claim, Secured

6 Claim, Non-Tax Priority Claim, Convenience Claim, or Priority Tax Claim.  The Plan provides

7 that, beginning on the first Business Date of the first calendar month following the end of the

8 calendar quarter in which the Allowed Priority Tax Claims are paid in full, and continuing on the

9 same date of the month following each calendar quarter thereafter, the Holders of Allowed

10 General Unsecured Claims shall receive *Pro Rata* distributions of $88,000.00, until the earlier of

11 the date on which all such Claims have been paid in full, and forty-eight (48) months following the

12 date of the first distributions to Holders of Allowed Class 4 Claims under the Plan.

13      Based on the projected Effective Date of June 1, 2021, it is anticipated that payments to

14 Holders of Allowed General Unsecured Claims will begin to receive distributions under the Plan

15 on or about October 1, 2024.  The total estimated amount of Allowed General Unsecured Claims

16 as of the date of the Plan is $4,767,105.33.

17 **G.**      Interest in the Debtors

18      All Interests in the Debtors are placed in Class 5.  Holders of Interests in the Debtors shall

19 have such Interests Reinstated on the Effective Date.

20 **IV.**

21 **REQUIREMENTS FOR PLAN CONFIRMATION ARE SATISFIED**

22      Section 1129 provides that a plan of reorganization shall be confirmed if the applicable

23 confirmation requirements set forth in section 1129 are satisfied.  The following discussion details

24 how the Plan satisfies each confirmation requirement set forth in section 1129.

25      **A.**    **The Plan Complies With The Applicable Provisions of Title 11 (Section 1129(a)(1))**

26      Section 1129(a)(1) requires that a plan comply with "the applicable provisions of" chapter

27 11 of the Bankruptcy Code.  It is generally accepted that, under section 1129(a)(1), the two

28 "applicable provisions" of the Bankruptcy Code are sections 1122 and 1123, which govern the

1  classification of claims and interests and the other contents of a plan.  7 COLLIER ON

2  BANKRUPTCY ¶ 1129.02[1] (Alan N. Resnick & Henry J. Sommer eds., 16th ed. 2019).  As

3  discussed below, the Plan satisfies the requirements of both sections 1122 and 1123.

4        **1.    The Plan Properly Classifies Claims (Section 1122)**

5        The Debtors have broad discretion to classify claims in a plan of reorganization.  *See,*

6  *Oxford Life Ins. Co. v. Tucson Self-Storage, Inc. (In re Tucson Self-Storage, Inc.)*, 166 B.R. 892,

7  897 (9th Cir. BAP 1994).  The only restriction on the creation of classes imposed by the

8  Bankruptcy Code is section 1122(a), which provides that a plan may place a claim or an interest in

9  a particular class only if the claim or interest is "substantially similar" to other claims or interests

10  in that class.  Claims that are secured by different collateral, or secured under different agreements,

11  are entitled to separate classification.  *Brady v. Andrew (In re Commercial Western Finance*

12  *Corporation)*, 761 F.2d 1329, 1338 (9th Cir. 1985) (holding that separate classification of

13  creditors' claims that were secured by different notes and deeds of trusts was valid).

14        In accordance with section 1122, the Plan classifies the Claims against the Debtors as

15  follows:

16      •    Class 1 consists of Secured Claims, if any.  These are Claims arising under loan

17  documents and are classified separately from Claims that are not secured by collateral.

18      •    Class 2 consists of all Allowed Non-Tax Priority Claims that are subject to

19  classification under the Bankruptcy Code.  These Claims are substantially similar because they are

20  all otherwise unsecured claims that are entitled to priority under the Bankruptcy Code and must

21  receive value on the Effective Date or on the date on which such Claim becomes due, whichever is

22  later.

23      •    Class 3 consists of all Convenience Claims. A Convenience Claim is an unsecured

24  Claim against the Debtors that is for $1,000 or less or the Holder of a Claim for more than $1,000

25  that elects to reduce its Claim to $1,000.

26      •    Class 4 consists of all General Unsecured Claims.  Class 4 Claims are all unsecured

27  claims asserted against the Debtors in an amount exceeding $1,000 and have equal priority under

28  the Bankruptcy Code.

1    The Plan's classification of Claims is proper.  The separate classification of the Secured,

2  Non-Tax Priority and Unsecured Claims is appropriate because the Debtors' obligations to each

3  Class are substantially unique, arise under different agreements, are secured by separate collateral,

4  or are unsecured.  Further, the separate classification of the Convenience Claims and the General

5  Unsecured Claims is appropriate because the Convenience Claims in Class 3 are substantially

6  similar in that they are all less than $1,000 or have been voluntarily reduced to $1,000 in exchange

7  for payment on the Effective Date.  Because the Plan places substantially similar Claims in the

8  same Class, section 1122 is satisfied.

9    **2.    The Plan Contains All Mandatory Provisions and Certain Permissive**

10    **Provisions Set Forth in Section 1123**

11    Section 1123 sets forth the mandatory and permissive contents of a plan.  As discussed

12  below, the Plan contains each of the mandatory provisions required by section 1123(a) and a

13  number of the provisions expressly permitted by section 1123(b).

14    *a) Compliance With Section 1123(a) (Mandatory Plan Provisions)*

15    i.    Section 1123(a)(1) (Designation of Classes of Claims and

16    Interests)

17    Section 1123(a)(1) requires that a plan designate classes of interests and claims, other than

18  claims of a kind specified in section 507(a)(2) (administrative expense claims), section 507(a)(3)

19  (claims arising during the period between the filing of the petition and the earlier of the

20  appointment of a trustee or order for relief in an involuntary case), and section 507(a)(8) (tax

21  claims).  The Plan does not classify Claims of the type described in sections 507(a)(2), 507(a)(3),

22  or 507(a)(8).  Administrative Claims under section 507(a)(2) and Priority Tax Claims under section

23  507(a)(8) are designated as unclassified Claims and are discussed in Article II of the Plan.  (Article

24  II.B.2 and II.B.3, pp. 8-9.)  There are no Claims under section 507(a)(3), as these Chapter 11 Cases

25  were commenced as voluntary chapter 11 cases.  All other Claims and Interests are classified in the

26  Plan.  As such, the Plan satisfies the requirements of section 1123(a)(1).

27  //

28  //

12

ii.      Section 1123(a)(2) (Specification Of Unimpaired Classes)

Section 1123(a)(2) requires that a plan "specify any class of claims or interests that is not impaired under the plan." Under section 1124, a class of claims is impaired unless each claim in that class is treated in one of the following ways: (a) the plan leaves unaltered the legal, equitable and contractual rights to which such claim is entitled; or (b) the plan cures any default, reinstates the maturity, compensates the holder for damages and does not otherwise alter the legal, equitable or contractual rights to which such claim entitles the holder.

The Plan clearly states that Classes 1, 2 and 5 under the Plan are unimpaired and provides for the treatment required under section 1124. (Article II.C.2, pp. 10-13). Accordingly, the Plan complies with section 1123(a)(2).

iii.     Section 1123(a)(3) (Specification of Treatment of Impaired Classes)

Section 1123(a)(3) requires that a plan "specify the treatment of any class of claims or interests that is impaired under the plan." The Plan states that Classes 3 and 4 are impaired under the Plan and specifies the treatment afforded to holders of Allowed Claims in each such Class. (Article II.C.2, pp. 10-13.) Accordingly, the Plan complies with section 1123(a)(3).

iv.      Section 1123(a)(4) (Same Treatment For Each Member Of A Class)

Section 1123(a)(4) requires that a plan "provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment of such particular claim or interest." The Plan provides the same treatment for each Claim contained in each of the Classes under the Plan, in compliance with section 1123(a)(4).

v.       Section 1123(a)(5) (Adequate Means For Implementation of Plan)

Section 1123(a)(5) requires that a plan "provide adequate means for the plan's implementation," and sets forth several examples of such adequate means. In accordance with section 1123(a)(5), the means for implementing the Plan are set forth in Article II.E of the Plan. (Article II.E, pp. 14-19).

13

1    In particular, the Plan provides that all Cash necessary to make payments under the Plan

2    shall be obtained from the Debtors' existing Cash balances on the Effective Date and the post-

3    Effective Date operation of the Debtors' businesses.  (Article II.E.2, pg. 15).

4    The Plan also provides that all property comprising the estate (including Retained Actions)

5    shall revest in the Debtors on the Effective Date, as expressly permitted by section 1123(a)(5)(B).

6    (Article II.E.1, pg. 13; Article IV.B, pg. 24).  The Plan also provides the mechanism, procedures

7    and timing for distributions to Holders of Allowed Claims and Interests.  (Article II.E.4, pp. 15-

8    18).  Finally, Article II of the Plan provides authority for the Debtors or the Reorganized Debtors

9    to execute all documents necessary or appropriate to effectuate the Plan.  (Article II.E.5, pp. 18).

10    Accordingly, the Plan provides sufficient means for its implementation and complies with

11    section 1123(a)(5).

12            vi.      Section 1123(a)(6) (Prohibition On Non-Voting Securities)

13    Section 1123(a)(6) of the Bankruptcy Code requires that, with respect to a corporate debtor,

14    the debtor's charter prohibit the issuance of nonvoting equity securities and provide for an

15    appropriate distribution of voting power amongst different equity classes.  In accordance with

16    section 1123(a)(6), the Plan provides that the Debtors' organizational documents shall be amended

17    to prohibit the Reorganized Debtors from issuing non-voting equity securities, to the extent

18    necessary to comply with section 1123(a)(6).  (Article II.E.1, pp. 14-15).

19            vii.     Section 1123(a)(7) (Selection Of Officers And Directors)

20    Section 1123(a)(7) requires that a plan "contain only provisions that are consistent with the

21    interests of creditors and equity security holders and with public policy with respect to the manner

22    of selection of any officer, director, or trustee under the plan and any successor to such officer,

23    director, or trustee."  As set forth in the Plan, on the Effective Date, Dr. Whalen shall be the

24    President, Secretary and Chief Medical Officer of the Reorganized Debtor Flex Group, Inc., and

25    the President and Chief Medical Officer of the PC Debtors.  Iris Whalen shall be the Chief

26    Executive Officer of the Reorganized Debtor Flex Group.  The directors of the Reorganized Debtor

27    Flex Group shall be the Whalens.  On the Effective Date, the Whalens will be appointed

28    automatically as the officers and directors of the Reorganized Debtors, as described in the Plan,

14

1  without any requirement of further action by members, creditors, directors, or managers of the

2  Debtors or the Reorganized Debtors, and their compensation for such services shall continue as

3  established under the approved insider compensation in the Chapter 11 Cases.

4      Accordingly, the Plan is consistent with creditors' interests and public policy and is in

5  compliance with section 1123(a)(7).

6         ***b)***    ***Compliance With Section 1123(b) (Permissive Plan Provisions)***

7      Section 1123(b) of the Bankruptcy Code describes certain permissive plan provisions.  The

8  Plan contains a number of these provisions, as follows:

9            i.    Section 1123(b)(1) (Impairment/Non-impairment)

10      Section 1123(b)(1) provides that a plan may "impair or leave unimpaired any class of

11  claims, secured or unsecured, or of interests."  As discussed above, the Plan impairs Classes 3 and

12  4, while Classes 1, 2 and 5 are unimpaired.  (Article II.C.2, pp. 10-13)

13            ii.    Section 1123(b)(2) (Assumption/Rejection of Executory

14            Contracts And Unexpired Leases)

15      Subject to section 365, section 1123(b)(2) permits a plan to provide for the assumption or

16  rejection of any executory contract and unexpired lease not previously rejected.  Rule 6006(a) of

17  the Federal Rules of Bankruptcy Procedure ("FRBP") provides that the assumption or rejection of

18  an executory contract or unexpired lease as a part of a plan is not governed by FRBP 9014.  Thus,

19  no separate motion, notice, or hearing is required.

20      Article III of the Plan provides for the assumption or rejection, as of the Effective Date, of

21  those unexpired leases and executory contracts that have not been previously rejected by Order of

22  the Court, including the Confirmation Order, or that are the subject of a pending motion to reject

23  (Article III.A.1, pp. 19-20).  Exhibit F to the Disclosure Statement identifies the unexpired leases

24  and executory contracts to be assumed and rejected by the Debtors upon the Effective Date

25  pursuant to the Confirmation Order.  As stated in Exhibit F, the Debtors reserve the right to modify

26  Exhibit F at any time before the Confirmation Hearing.  These Plan provisions are appropriate

27  under section 1123(b)(2).

28

1                    iii.      <u>Section 1123(b)(3) (Claims or Interests Belonging to the</u>

2                          <u>Estate)</u>

3       Section 1123(b)(3) provides for, *inter alia*, "the settlement or adjustment of any claim or

4 interest belonging to the debtor or to the estate; or the retention and enforcement by the debtor, by

5 the trustee, or by a representative of the estate appointed for such purpose, of any such claim or

6 interest." Article III.B of the Plan preserves all claims, causes of action, rights of action, suits and

7 proceedings of the Debtors or the Estates (the "Retained Actions"), and provides that the Debtors

8 shall receive and retain, and may enforce, all Retained Actions. (Article III.B, pg. 21). These

9 provisions of the Plan are appropriate under section 1123(b)(3).

10                    iv.      <u>Section 1123(b)(6) (Other Appropriate Provisions)</u>

11       Section 1123(b)(6) provides that a plan may "include any other appropriate provision not

12 inconsistent with the applicable provisions of [the Bankruptcy Code]." Examples of additional

13 permissive provisions include, but are not limited to, provisions for the retention of jurisdiction by

14 the court, release of claims and enjoining the prosecution of future claims against a non-debtor

15 entity. See 7 COLLIER ON BANKRUPTCY ¶ 1123.02[6] (Alan N. Resnick & Henry J. Sommer

16 eds., 16th ed. (2019)).

17       In the present case, the Plan provides for, among other things, (a) the retention of

18 jurisdiction by the Bankruptcy Court over issues and matters arising from and related to the

19 Chapter 11 Cases and the Plan (Article III.C, pp. 21-23), (b) enjoining entities with satisfied

20 Claims or terminated Interests under the Plan from taking any future action against the (i) Debtors,

21 (ii) the Reorganized Debtors, (iii) any Insider or affiliate of the Debtors and (iv) the present

22 directors, officers, managers, employees, legal advisors and other professionals to the foregoing (in

23 such capacity) (collectively, the "Exculpated Parties") on account of any such satisfied claims or

24 terminated interests (Article IV.D.1, pp. 25-26), (c) the exculpation and limitation of liability of the

25 Exculpated Parties (Article IV.D.2, pp. 26-27).

26       These provisions are consistent with the Bankruptcy Code. In particular, with respect to

27 releases of non-Debtors entities, courts have indicated that such releases are valid and binding

28 within certain parameters. Bankruptcy courts have jurisdiction to approve plans of reorganization

that contain releases of third parties from claims by certain creditors. *See, In re AOV Industries, Inc.*, 792 F.2d 1140, 1145 (D.C. Cir. 1986); *In re Master Mortg. Inv. Fund, Inc.*, 168 B.R. 930, 936 (Bankr. W.D. Mo. 1994).

Moreover, mere inclusion of release language in a proposed plan does not violate the provisions of the Bankruptcy Code. *Trulis v. Barton*, 67 F.3d 779, 785 (9th Cir. 1995) (Plan containing third-party releases upheld on appeal). While some case law holds that any third-party releases or injunctive relief contained in a plan may later be challenged and deemed to be unenforceable (see *In re Lowenshuss*, 67 F.3d 1394, 1402 (9th Cir. 1995) [on appeal, court vacated only the general release provision in the plan]), there is no prohibition on the Debtors including releases to the fullest extent permissible by law. Thus, the Debtors request that the Order confirming the Plan expressly state that the provisions of the Plan containing releases and injunction relief for the benefit of any non-Debtor parties under the Plan shall be approved and enforceable solely "to the fullest extent permitted by law."

Accordingly, the Debtors request that the Bankruptcy Court confirm the Plan, including the injunction and third-party releases, without making any specific findings as to the extent and effectiveness of such provisions.

In sum, the Plan complies both with the classification provisions of section 1122 and with the mandatory and permissive provisions of section 1123. Accordingly, the Plan satisfies the requirements of section 1129(a)(1).

**B. The Debtors, As The Plan Proponents, Have Complied With The Provisions Of Title 11 (Section 1129(a)(2))**

Section 1129(a)(2) focuses on the entity proposing a plan and requires that the proponent comply with the "applicable provisions" of title 11. In this context, the "applicable provision" of title 11 is section 1125, dealing with the disclosure and solicitation of acceptances of a plan. *See, In re PWS Holding Corp.*, 228 F.3d 224, 228 (3d Cir. 2000). The principal purpose of section 1129(a)(2) is to ensure that plan proponents have complied with the solicitation and disclosure requirements of section 1125. 7 COLLIER ON BANKRUPTCY ¶ 1129.02[2] (Alan N. Resnick & Henry J. Sommer eds., 16th ed. (2019)).

### 1.  Section 1125(a) (Disclosure Regarding A Plan)

Section 1125(a) provides the standard by which the Court shall judge whether a proposed disclosure statement contains adequate disclosure regarding the plan to the holders of claims and interests.   At the Disclosure Statement Hearing on March 2, 2021, the Bankruptcy Court approved the Disclosure Statement as containing adequate information under section 1125.

### 2.  Section 1125(b) (Disclosure and Solicitation Of Acceptances Of A Plan)

Section 1125(b) provides that a proponent may not solicit acceptances of its plan unless, at or before the time of such solicitation, there is transmitted to each holder of a claim or interest a copy of the plan (or a summary of the plan) and a court-approved disclosure statement.  *See, In re Rook Broadcasting of Idaho, Inc.*, 154 B.R. 970, 976 (Bankr. D. Idaho 1993).  The Debtors have complied fully with this requirement.  The Bankruptcy Court approved the Disclosure Statement and approved the confirmation procedures at the Disclosure Statement Hearing on March 2, 2021. In accordance with the Court's ruling, Local Bankruptcy Rule 3017-1 and FRBP 3017(d), on March 23, 2021, the Debtors transmitted the Disclosure Statement and Plan to all known Creditors and Interest holders of the Debtors who were entitled to vote on the Plan, and to other parties in interest.  Therefore, the Debtors have complied with the solicitation requirements of section 1125.

### C.  <u>The Plan Has Been Proposed in Good Faith (Section 1129(a)(3))</u>

Section 1129(a)(3) requires that a plan has been "proposed in good faith and not by any means forbidden by law."  Although the term "good faith" is not defined by the Bankruptcy Code, a plan is considered proposed in good faith if there is a "reasonable likelihood that the plan will achieve a result consistent with the standards prescribed under the Code." *In re Madison Hotel Assocs.*, 749 F.2d 410, 425 (7th Cir. 1984).  Good faith requires fairness in dealing with the debtor's creditors and is to be determined by the bankruptcy court in light of the totality of the circumstances. *In re Stolrow's Inc.*, 84 B.R. 167, 172 (9th Cir. 1988).

The evidence before the Court supports the finding that the Plan has been proposed in good faith and not by any means forbidden by law, thereby satisfying section 1129(a)(3).  The Plan was developed after many months of analysis, negotiation and strategizing among the Debtors and their professionals with respect to the corporate structure of the Reorganized Debtors, the treatment of

1  creditors and the payment of Claims.  After complete analysis of the Debtors' assets and projected

2  cash flow, the Plan was developed and proposed with the legitimate and honest purpose of

3  maximizing the value of the Debtors' estates and providing the best recovery possible to creditors

4      Accordingly, the Court may determine that the Plan has been proposed in good faith and

5  not by any means forbidden by law.

6  **D.  The Plan Provides For Court Approval of Fees and Costs Paid By the Estates (Section**

7      **1129(a)(4))**

8      Section 1129(a)(4) requires that:

9          "[a]ny payment made or to be made by the proponent, by the debtor, or
           by a person issuing securities or acquiring property under the plan, for

10         services or for costs and expenses in or in connection with the case, or
           in connection with the plan and incident to the case, has been approved

11         by, or is subject to the approval of, the court as reasonable."

12     Article II of the Plan discusses the Debtors' expected Administrative Claims and provides

13  for payment, in accordance with section 1129(a)(4), upon Bankruptcy Court review and approval

14  of all applications for compensation of Professionals for fees and expenses incurred on or before

15  the Effective Date of the Plan.  (Article II.B.2 and II.B.4, pp.8-9.)  As the Plan provides that

16  payments of the type specified in section 1129(a)(4) will be made only after they have been

17  approved by the Bankruptcy Court as reasonable, this requirement for confirmation is satisfied.

18  **E.  Identification of the Reorganized Debtors' Proposed Officers and Directors (Section**

19     **1129(a)(5))**

20     Section 1129(a)(5) provides that the proponent of the plan must disclose the identity and

21  affiliations of anyone proposed to serve as a director or officer of the reorganized debtor, an

22  affiliate of the debtor participating in a joint plan with the debtor, or a successor to the debtor under

23  the plan.  Article II.E.3 identifies the individuals who will serve as the officers and directors of the

24  Reorganized Debtors (Article II.E.3, pg. 15).  Accordingly, Section 1129(a)(5) is satisfied.

25  **F.  The Plan Does Not Alter Regulated Rates (Section 1129(a)(6))**

26     Section 1129(a)(6) requires that, before a plan may be confirmed, any change in a regulated

27  rate must be pre-approved by the regulating agency, or the rate change must be expressly

28

conditioned on such approval.  The Plan does not involve change in regulated rates and therefore, section 1129(a)(6) is inapplicable because there is no rate change to approve.

### G.  **The Plan Satisfies the Best Interests Test (Section 1129(a)(7))**

The "best interests of creditors" test embodied in section 1129(a)(7) requires that the plan proponent demonstrate that, with respect to each impaired class of claims or interests, the holder of each claim or interest in such class either has accepted the plan or will receive or retain under the plan property of a value, as of the effective date of the plan, that is not less than the amount that such holder would receive or retain if the debtor were to be liquidated under chapter 7 of the Bankruptcy Code.  *See, Bank of Am. Nat'l Trust and Savings Ass'n v. 203 N. LaSalle St. Partnership*, 526 U.S. 434, 442 (1999).

The Plan provides that each Holder of an Allowed Claim or Interest will receive at least as much under the Plan as such Holders would receive under a chapter 7 liquidation.  Specifically, the best interest of creditors is met here because the Plan proposes to pay all Secured Claims, Non-Tax Priority Claims, Convenience Claims and Interests 100% of the value of their Allowed Claims or Interests or to Reinstate such Claim or Interest.  With respect to creditors holding Secured Claims, the Plan provides for the Reinstatement of the Secured Claims in accordance with the Bankruptcy Code and Plan.  With respect to General Unsecured Creditors, the Plan provides for payments over a period of 48 months, for a total expected return to Holders of General Unsecured Claims of approximately 30%.  As demonstrated in the Liquidation Analysis, attached to the Disclosure Statement as Exhibit E, under a hypothetical chapter 7 case, the Holders of General Unsecured Claims and Convenience Claims likely would not receive any payment on account of their Claims.  In addition, Holders of Non-Tax Priority Claims likely would not receive full payment on account of their Claims.

Therefore, in the event of a liquidation under chapter 7, Creditors would receive no better treatment or payment than what they would receive under the Plan, but could face significant delay in receiving any payment on account of their Allowed Claims following the liquidation of the Debtors' assets and subsequent distribution by a chapter 7 trustee.

Because all Creditors will receive an amount that is equal to or greater than they would receive in a chapter 7 liquidation, the Plan provides the greatest feasible recovery to all Creditors and complies with section 1129(a)(7).

**H.  Acceptance or Unimpairment (Section 1129(a)(8))**

Section 1129(a)(8) requires that each class of claims and interests either has accepted the plan or is not impaired under the plan.  A class of claims accepts the plan if holders of at least two-thirds in dollar amount and a majority in number of claims of that class vote to accept the plan, counting only those claims whose holders actually vote to accept or reject the plan.

Classes 1, 2 and 5 under the Plan are unimpaired and therefore deemed to have accepted the Plan pursuant to section 1126(f).  The Debtors anticipate that Classes 3 and 4 will accept the Plan.  Thus, the Plan satisfies section 1129(a)(8).

**I.  Administrative and Priority Claims (Section 1129(a)(9))**

Section 1129(a)(9) contains provisions generally requiring payment in cash of administrative and priority claims and permitting the deferred payment of priority tax claims over a period not exceeding five years.  Section 1129(a)(9)(A) requires that the holder of an administrative claim receive payment of the amount of the allowed claim on the effective date of the plan.  Article II.B of the Plan provides for the payment in full in cash of each Allowed Administrative Claim on the Effective Date (except to the extent that such payment is pending final approval of professional fees by the Bankruptcy Court).  (Article II.B.2, pg. 8).

Section 1129(a)(9)(B) requires the holder of certain priority claims to receive payments equal to the allowed amount of such claims.  There are no creditors holding or asserting Non-Tax Priority Claims against the Debtors.  Therefore, section 1129(a)(9)(B) is inapplicable.

Section 1129(a)(9)(C) provides that, with respect to priority tax claims, "the holder of such claim will receive on account of such claim regular installment payments in cash (1) of a total value, as of the effective date of the plan, equal to the allowed amount of such claim; (ii) over a period ending not later than 5 years after the date of the order for relief…; and (iii) in a manner not less favorable than the most favored nonpriority unsecured claim provided for by the plan."  Article II.B of the Plan provides for the payment in full of Allowed Priority Tax Claims in

1  accordance with the requirements of section 1129(a)(9)(C).  (Article II.B.3, pg. 9).  Such treatment

2  is not less favorable than the treatment afforded to the most favored nonpriority unsecured class of

3  creditors.  Therefore, section 1129(a)(9)(C) is satisfied.

4       Section 1129(a)(9)(D) provides that any holder of a secured claim that would otherwise be

5  an unsecured claim of a governmental unit under section 507(a)(8) but for the secured status of the

6  claim shall receive on account of such claim cash payments in the same manner and over the same

7  time as prescribed in section 1129(a)(9)(C).  There are no such secured claims filed or asserted

8  against the Estates in these Chapter 11 Cases.  Therefore, section 1129(a)(9)(D) is inapplicable.

9       Based upon the foregoing, the Plan complies with section 1129(a)(9).

10  **J.   Acceptance By One Impaired Class (Section 1129(a)(10))**

11       Section 1129(a)(10) requires that, if a class of claims is impaired under the Plan, at least

12  one class of impaired claims has accepted the plan, determined without including any acceptance

13  of the plan by an insider holding a claim in such class.  The Debtors anticipate that Class 3, Class

14  4, or both will accept the Plan.  Therefore, the Debtors have complied with section 1129(a)(10).

15  **K.   The Plan is Feasible (Section 1129(a)(11))**

16       Section 1129(a)(11) requires that "[c]onfirmation of the plan is not likely to be followed by

17  the liquidation, or need for further financial reorganization, of the debtor or any successor to the

18  debtor under the plan, unless such liquidation or reorganization is proposed in the plan."  This

19  requirement is often referred to as the "feasibility" requirement.  7 COLLIER ON BANKRUPTCY

20  ¶ 1129.02[11] (Alan N. Resnick & Henry J. Sommer eds., 16th ed.(2019)).  The key element of

21  feasibility is whether there exists a reasonable probability that the provisions of the plan can be

22  performed.  See *In re Acequia, Inc.*, 787 F.2d at 1365 (A plan is feasible if it has a likelihood of

23  viability and is not simply a "visionary scheme.").

24       The Debtors have demonstrated the ability to pay the required Effective Date payments and

25  the projected Plan payments.  The Debtors prepared detailed cash flow projections (the

26  "Projections," see Exhibit G to the Disclosure Statement) that show that the Debtors anticipate

27  having approximately $644,880 in Cash on the Effective Date to make the required Effective Date

28  payments.  To the extent that the available Cash is insufficient to pay all Effective Date payments,

certain of the estate professionals have agreed to accept payment of their final fees in installments over a period of time after the Effective Date to allow the Debtors to confirm the Plan.  In addition, the Debtors currently are negotiating with one or more non-professional Holders of Administrative Claims, with the goal of reaching agreement to allow the Debtors to pay some or all of the Allowed Administrative Claims in installments.

With respect to the payments to be made to creditors over the term of the Plan, the Projections demonstrate that the Debtors' expected income and revenue from their business operations will be sufficient to make all Plan payments through 2028.  The Projections were prepared by the Debtors' officers, the Whalens, and were based on a comprehensive analysis of revenue and expenses data dating back to 2018, although the most reliance was placed on recent data from 2020.  The Projections take into consideration the gradual return to business at full capacity, as the COVID-19 pandemic diminishes, and modest growth of the newer Flexogenix clinics.  In addition, the Projections account for inflation and increasing costs of regular business expenses, including a 6% year-over-year increase in the Debtors' payroll expense.

Accordingly, as shown in the detailed Projections, the Plan has a reasonable likelihood of viability and satisfies the feasibility requirement of section 1129(a)(11).

**L.  <u>Section 1930 Fees (Section 1129(a)(12))</u>**

Section 1129(a)(12) requires that a plan provide that all fees payable under 28 U.S.C. § 1930, consisting primarily of the quarterly fees to the United States Trustee, be paid on the effective date of the plan.  Articles II.B.1 and IV.I of the Plan provides for such payment and, therefore, the Plan complies with section 1129(a)(12).

**M.  <u>Retirees Benefits (Section 1129(a)(13))</u>**

Section 1129(a)(13) requires that a plan provide for the continued payment of certain retiree benefits "for the duration of the period that the debtor has obligated itself to provide such benefits."  The Debtors have no future obligation for any "retiree benefits," as that term is defined by Sections 1129(a)(13) and 1114 and, therefore, section 1129(a)(13) is inapplicable to the Plan.

//

//

1

## V.

## CONCLUSION

The Plan satisfies each of the applicable confirmation requirements in section 1129.  For the reasons set forth above, for the benefit of Creditors and in the best interests of the Estates, the Debtors respectfully request that the Bankruptcy Court confirm the Plan.

Dated:   March 24, 2021                          **MARGULIES FAITH LLP**


                                                 By:____/s/ Monsi Morales_____
                                                         Monsi Morales
                                                         Jeremy W. Faith
                                                 Counsel for the Debtors and Debtors in Possession

### DECLARATION OF SEAN WHALEN

I, Sean Whalen, declare as follows:

1.      I am an individual residing in the State of California and am the Chief Medical Officer and co-owner of Flexogenix Group, Inc. ("FGI"), and the Chief Executive Officer and sole shareholder of Flexogenix Georgia, PC ("FGPC"), Flexogenix North Carolina, PC ("FNCPC"), Flexogenix Oklahoma, PC ("FOPC"), and Whalen Medical Corporation ("WMC"), the debtors and debtors-in-possession (collectively, the "Debtors") in the above-captioned jointly administered chapter cases.  If I were called to testify as a witness in this matter, I could and would competently testify to each of the facts set forth herein.

2.      I make this declaration in my capacity as an officer of the Debtors, and in support of confirmation of the *Flexogenix Debtors' Third Amended Joint Plan Of Reorganization Dated March 23, 2021* (the "Plan").  Capitalized terms used in this Declaration and not defined shall have the meanings stated in the Plan.

### General Background

3.      Flex Group is a California corporation that was founded in or about January 2015. Pursuant to pre-petition management agreements between Flex Group and the PC Debtors (defined below), Flex Group provides management services to the PC Debtors.

4.      Flex NC is a North Carolina professional corporation that was founded in or about June 2015.  Flex NC owns and operates three nonsurgical orthopedic joint care clinics in North Carolina.

5.      Flex OK is an Oklahoma professional corporation that was founded in or about March 2018.  Flex OK owns and operates a nonsurgical orthopedic joint care clinic in Oklahoma City, Oklahoma.

6.      Flex GA is a Georgia professional corporation that was founded in or about January 2017.  Prior to the Petition Date, Flex GA owned and operated a nonsurgical orthopedic joint care

clinic in Atlanta, Georgia.  Flex GA closed its Atlanta clinic and ceased all business operations after the commencement of these Chapter 11 Cases.

7.      WMC is a California corporation that was founded in or about April 2013 as Flexogenix, Inc.  In or about January 2015, the company changed its name to Mogannam & Whalen Medical Corporation, and in or about June 2017, the company changed its name again to Whalen Medical Corporation.  Prior to the Petition Date, WMC owned and operated a nonsurgical orthopedic joint care clinic in Los Angeles, California, under the name "Flexogenix Los Angeles." WMC closed its Los Angeles clinic and ceased all business operations after the commencement of these Chapter 11 Cases.

**Events Leading to Chapter 11 Filings**

8.      In 2017-2018, the Debtors began experiencing cash flow issues stemming from decreased collections and expenses arising from certain struggling clinics, principally those located in Los Angeles and Atlanta, as well as increasing start-up costs and expenses for new locations such as Oklahoma City, Oklahoma.

9.      Around the same time, the Debtors abruptly separated from their closely-tied advertising partner, which was responsible for all Flexogenix brand advertising, due to conflicts of interest that had arisen and the advertising company's relationships with and treatment of the Debtors' competitors.

10.     The sudden loss of all advertising caused a significant and unexpected decrease in the Debtors' business, as the Debtors were forced to rebuild their significant advertising efforts from the ground up on their own, while running the businesses.

11.     To stabilize their revenue and support necessary expenses, beginning in or about November 2017 and continuing through February 2019, certain of the Debtors obtained financing from several above-market lenders.  During this period, the Debtors borrowed a total of approximately $11.1 million from ten separate lenders (the "Lenders").

12.     All of the loan funds received from the Lenders were used to pay the obligations of the Debtors, including, but not limited to, employee salaries, vendor payments, rent for the clinics.

13.     The Debtors were able to make significant payments to the Lenders pre-petition. Specifically, with respect to the agreements that were paid in full prior to the Petition Date, the Debtors borrowed $3.9 million and repaid in excess of $5.5 million.  For the agreements that remained open as of the Petition, the Debtors borrowed a total of $7.2 million and have paid back nearly $3.4 million.

14.     Despite the substantial payments to the Lenders, and due to the exorbitant interest charged by the Lenders, as of the Petition Date, the Debtors purportedly owed approximately $6.4 million to six of the Lenders.

15.     The Lenders are merchant cash advance ("MCA") companies.

16.     Each of the Lenders' agreements purported to grant the Lender a security interest in certain of the Debtors' accounts receivable and personal property.  I am informed and believe that less than half of the Lenders took any action to perfect their alleged security interests, and most, if not all, of the filings that do purport to perfect a Lender's alleged security interest are objectionable and avoidable as preferential and/or fraudulent transfers.

17.     Four of the Lenders filed proofs of claim in the Chapter 11 Cases, asserting secured claims totaling approximately $1 million and unsecured claims totaling approximately $5.3 million.

18.     The Debtors dispute the claims of the Lenders and have commenced adversary proceedings in the Bankruptcy Court against the Lenders for avoidance of fraudulent and/or preferential transfers, recovery of property transferred and, where applicable, disallowance of claims.

19.     As MCA companies asserting purported security interests in certain of the Debtors' accounts receivable, the Lenders' agreements provided for daily draws by the Lenders from the Debtors' bank accounts to pay down the loans, in excess of $73,000 per day in total as of the Petition Date.

20.     The substantial and burdensome daily withdrawals of cash by the Lenders, combined with ordinary and necessary business expenses, began exceeding the Debtors' revenue collections. Without availability of additional capital or financing, the Debtors decided to commence the Chapter 11 Cases with the goal of restructuring their debt and reorganizing as an on-going business..

**The Chapter 11 Case and Plan Formation**

21.     On March 18, 2019 (the "Petition Date"), the Debtors filed their voluntary petitions in the Bankruptcy Court, commencing the Chapter 11 Cases.

22.     On March 19, 2021, the Bankruptcy Court entered its Orders authorizing the joint administration of the Chapter 11 Cases.

23.     No creditors' committee was appointed in the Chapter 11 Cases.

24.     To fix the problems that led to the bankruptcy filing and achieve a successful reorganization, the Debtors worked to improve the efficiency and reduce the costs of their business operations over the course of the Chapter 11 Cases.

25.     The Debtors developed and have maintained ongoing directives for the clinics designed to control labor expenses and inventory costs.

26.     In addition to implementing changes at the operations level, the Debtors also terminated certain burdensome leases and contracts.

27.     Finally, because they were not operating profitably, Flex GA and WMC ceased their business operations at the outset of the Chapter 11 Cases.

28.     The Debtors commenced the Chapter 11 Cases with the goals of reducing the Debtors' operations to only those clinics that are operating profitably and eliminating burdensome leases and contracts, which actions would allow the Debtors to reorganize successfully.

29.     During the Chapter 11 Cases, the Debtors analyzed their businesses to determine the best manner to exit bankruptcy and continue their businesses successfully.  That analysis included a thorough consideration of the corporate structure and management of the Debtors, as well as review and application of applicable corporate and health care laws and guidelines.  In this respect, the Debtors sought and obtained strategic and specialized advice from their special health care counsel, Nelson Hardiman.

30.     With respect to the exit strategy, the Debtors explored potential post-petition financing arrangements with various entities, which arrangements included DIP financing loan facilities, exit financing and/or possible equity arrangements.

31.    In addition, the Debtors successfully negotiated settlements with certain creditors holding administrative claims, thereby reducing the amount of Cash needed on the Effective Date and further supporting the Plan's feasibility.

32.    Finally, after initially preparing and considering separate plans for each Debtor, the Debtors ultimately determined that a single consolidated plan of reorganization is appropriate and in the best interests of all creditors.

33.    While each of the Debtors maintains separate books and records and the Debtors can trace funds into and out of each of the Debtors, in many cases it is very difficult for the Debtors to identify the specific Debtor that is liable on a Claim.

34.    The Debtors have historically been, and presently continue to be, effectively operated as a single enterprise, and creditors have traditionally treated the Debtors as a single enterprise.

35.    I believe that, if the Debtors were required to review each Claim to determine which Debtor was liable for the Claim and which Debtor was not liable for the Claim (and then resolve any disputes as to the determination of which Debtor is liable), the costs to the Estates would far outweigh any benefit to the Estates and Holders of the Claims.

**The Plan**

36.    On March 23, 2021, the Debtors filed and served their Plan, the Disclosure Statement and the Confirmation Notice.  The Confirmation Hearing is scheduled for May 11, 2021.

37.    As of the Petition Date, the Debtors estimate that they owe approximately $1 million in Priority Tax Claims and approximately $4,767,105.33 in Allowed General Unsecured Claims.

38.    The Debtors would be unable to provide the distributions and benefits offered to the Creditors and Interest Holders under the Plan without the significant compromises reached and restructuring of debt in these Chapter 11 Cases, as proposed in the Plan.

39.    I am informed and believe that, if the Plan is not confirmed, liquidation of the estates under chapter 7 is likely the only alternative, in which case some or all of the compromises achieved in the Chapter 11 Cases may be lost, a chapter 7 trustee would be forced to sell the Debtors' assets, likely at liquidation value, the Debtors' businesses would be shut down, eliminating the potential for

future revenue providing Cash for payment to creditors over time, and creditors of the estates would face significant delay in payment on their Claims while the assets are liquidated by a chapter 7 trustee.

40.    For the reasons stated, I believe that immediate confirmation of the Plan is in the best interests of the estates, the creditors and the Debtors.

41.    I believe that the Plan has been proposed in good faith.  The Plan was developed after many months of analysis, negotiation and strategizing among the Debtors and their professionals with respect to the corporate structure of the Reorganized Debtors, the treatment of creditors and the payment of Claims.

42.    After complete analysis of the Debtors' assets and projected cash flow, I believe that the Plan was developed and proposed with the legitimate and honest purpose of maximizing the value of the Debtors' estates and providing the best recovery possible to creditors.

**The Plan Cash Flow Projections**

43.    Iris Whalen, the Chief Executive Officer of Flex Group, and I prepared the detailed cash flow projections for the Plan (the "Projections," see Exhibit G to the Disclosure Statement). We most recently analyzed and updated the Projections on March 22, 2021, to be included with the Plan and Disclosure Statement.

44.    As shown on the Projections, the Debtors anticipate having approximately $644,880 in Cash on the Effective Date to make the required Effective Date payments.

45.    To the extent that the available Cash is insufficient to pay all Effective Date payments, certain of the estate professionals have agreed to accept payment of their final fees in installments over a period of time after the Effective Date to allow the Debtors to confirm the Plan.

46.    In addition, the Debtors currently are negotiating with one or more non-professional Holders of Administrative Claims, with the goal of reaching agreement to allow the Debtors to pay some or all of the Allowed Administrative Claims in installments.

47.    As a result of these negotiations, to date the Debtors have reached agreements with two Holders of Administrative Claims whereby the claimants will accept reduced amounts in

satisfaction of their claim and/or payments in regular installments on and after the Effective Date.

48.    With respect to the payments to be made to creditors over the term of the Plan, the Projections demonstrate that the Debtors' expected income and revenue from their business operations will be sufficient to make all Plan payments through 2028.

49.    In preparing the Projections, the following assumptions or factors were considered:

a.    Extended cashflow projections for Flexogenix were based directly upon past expenditures and expenses in proportion to relative gross revenue over the last 3 years dating back to 2018, but most directly to recent data for 2020.

b.    In March of 2020, the economic retraction related to the COVID-19 global pandemic necessitated a complete closure of all Flexogenix clinic locations for a period of one week followed by a 50% reduction in operations across all clinics from pre-pandemic levels through 2020 and, in most cases, into 2021.

c.    The decision to limit operations facilitated reductions in both payroll and advertising expenditures, the two largest operational expenses for Flexogenix.

d.    Now, approximately one year following this reduction, the Debtors have realized some gradual re-expansion of operations, specifically, to 75% normal operations in our Cary clinic, and the Debtors anticipate continued gradual re-expansion of schedule and operations, accordingly.

e.    Taking into account the anticipated re-expansion, the Debtors are projecting a 40% increase in revenue over LTM (last 12 months) revenue, followed by continued annual revenue increases tapering to a steady state YOY (year-over-year) increase of 1% by 2026.

f.    The projected revenue increases take into consideration, not only the gradual return to full schedule across all clinics during this period, but also account for the expected growth of newer, less developed clinics, such as Oklahoma City (Rank order of clinic maturity: Cary > Charlotte > Greensboro> Oklahoma City).

g. All expenses within the projection period are proportionally based upon the projected revenue, according to historic data.

h. A six percent (6%) YOY increase in payroll is projected.

i. Gradually diminishing but ongoing legal expenses related to the administration and negotiation of the Plan and pending (and potential) litigation are projected throughout the Plan period.

50. Based on the Projections and my experience with the Debtors and their businesses, I believe that the Plan has a reasonable likelihood of viability, is not likely to be followed by the liquidation, or further financial reorganization, of the Debtors and is feasible.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 23rd day of March 2021 at Los Angeles, California.


_____
Sean Whalen

## DECLARATION OF MONSI MORALES

I, Monsi Morales, declare:

1.      I am a partner with the law firm of Margulies Faith LLP ("MF"), reorganization counsel for the debtors and debtors in possession (the "Debtors").  I have personal knowledge of the facts set forth in this declaration and, if called as a witness, could and would competently testify thereto.

2.      I make this declaration in support of confirmation of the *Flexogenix Debtors' Third Amended Joint Plan Of Reorganization Dated March 23, 2021* (Dkt. No. 336, the "Plan"). Capitalized terms used in this Declaration have the same meaning as stated in the Plan.

3.      The Debtors filed a voluntary petition under chapter 11 of 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code") on March 18, 2019 (the "Petition Date"). No official committee of creditors was formed in the Debtors' bankruptcy cases (the "Chapter 11 Cases"). No bankruptcy trustee was appointed in the Chapter 11 Cases.

4.      The Bankruptcy Court (the "Court") authorized the joint administration of the Chapter 11 Cases by Order entered on March 19, 2019.

5.      I appeared at a hearing on March 2, 2021 (the "Disclosure Statement Hearing"), at which time the Court approved the Debtors' *Disclosure Statement Describing Flexogenix Debtors' Second Amended Plan of Reorganization Dated January 19, 2021*, in substantially the same form as filed, as containing adequate information for the solicitation of votes with respect to the Plan.

6.      On March 20, 2021, I, on behalf of the Debtors, lodged an Order (the "Disclosure Statement Order") approving the disclosure statement, authorizing the proposed plan solicitation procedures and setting confirmation dates and deadlines, in accordance with the Court's ruling at the Disclosure Statement Hearing.  The Disclosure Statement Order has not yet been entered by the Court.

7.      In accordance with the Court's ruling at the Disclosure Statement Hearing, on March 23, 2021, the Debtors filed the Plan and the *Disclosure Statement Describing Flexogenix*

*Debtors' Third Amended Plan of Reorganization Dated March 23, 2021* (the "Disclosure Statement") and served (a) the Disclosure Statement, (b) the Plan, (c) appropriate balloting materials and (d) a notice (the "Confirmation Notice") of the confirmation hearing (the "Confirmation Hearing") on the Plan on all creditors entitled to vote in accordance with the solicitation procedures approved by the Court.

8.      In addition, on March 23, 2021, the Debtors served the Confirmation Notice on all creditors, equity interest holders and other parties in interest in the Chapter 11 Cases.

9.      At the Disclosure Statement Hearing, the Court instructed that completed ballots are required to be returned to counsel for the Debtors by April 13, 2021, at 5:00 p.m.  Similarly, any party wishing to object to confirmation of the Plan must file and serve a written objection no later than April 13, 2021.  These deadlines were provided to all creditors and parties in interest in the Confirmation Notice (see Dkt. No. 338).

10.     On or before April 20, 2021, the Debtors will submit their ballot analysis (the "Ballot Analysis"), in which the results of the Plan voting will be tabulated and verified, and a written reply to objections to confirmation, if any.

11.     To the extent that the available Cash is insufficient to pay all Effective Date payments, certain of the estate professionals, including MF, have agreed to accept payment of their final fees in installments over a period of time after the Effective Date to allow the Debtors to confirm the Plan.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this 23rd day of March 2021, at Castaic, California

*/s/ Monsi Morales*
Monsi Morales

34

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:
16030 Ventura Blvd., Suite 470, Encino, CA 91436

A true and correct copy of the foregoing document entitled **DEBTORS' MOTION FOR ORDER CONFIRMING FLEXOGENIX DEBTORS' THIRD AMENDED JOINT PLAN OF REORGANIZATION DATED MARCH 23, 2021; MEMORANDUM OF POINTS AND AUTHORITIES; DECLARATIONS OF SEAN WHALEN AND MONSI MORALES**
 will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**: Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document.
On **March 24, 2021**, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

☒  Service information continued on attached page

**2.  SERVED BY UNITED STATES MAIL**:
On **March 24, 2021** , I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

JUDGE: Honorable Barry Russell, U.S. Bankruptcy Court, 255 E. Temple St., Ste. 1660, Los Angeles, CA 90012
U.S. Securities and Exchange Commission, Attn: Bankruptcy Counsel, 444 South Flower St., Ste. 900, Los Angeles, CA 90071-9591
Office of the United States Trustee, 915 Wilshire Blvd., Suite 1850, Los Angeles, CA 90017

☐  Service information continued on attached page

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on _____, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

☐  Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| March 24, 2021 | Angela Saba | /s/ Angela Saba |
|---|---|---|
| _Date_ | _Printed Name_ | _Signature_ |

---

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

## ADDITIONAL SERVICE INFORMATION (if needed):

**1. TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF):**


**ATTORNEY FOR INTERESTED PARTY: Brett Berman**    bberman@foxrothschild.com, jdistanislao@foxrothschild.com
**ATTORNEY FOR CREDITOR: J Scott Bovitz**    bovitz@bovitz-spitzer.com
**ATTORNEY FOR INTERESTED PARTY: Richard D Buckley**    richard.buckley@arentfox.com
**ATTORNEY FOR CREDITOR: Crispin L Collins**    crispin.collins@nelsonmullins.com, crispin_collins@yahoo.com
**ATTORNEY FOR DEBTOR: Jeremy Faith**    Jeremy@MarguliesFaithlaw.com, Helen@MarguliesFaithlaw.com;
Victoria@MarguliesFaithlaw.com;Noreen@MarguliesFaithlaw.com;Angela@MarguliesFaithlaw.com
**ATTORNEY FOR INTERESTED PARTY: Todd S Garan**    ch11ecf@aldridgepite.com,
TSG@ecf.inforuptcy.com;tgaran@aldridgepite.com
**ATTORNEY FOR INTERESTED PARTY: George R Hiersche**    robin@hlfokc.com, robin@hlfokc.com
**ATTORNEY FOR DEBTOR: Noreen A Madoyan**    Noreen@MarguliesFaithLaw.com,
Helen@MarguliesFaithlaw.com;Vicky@MarguliesFaithlaw.com;Angela@MarguliesFaithlaw.com
**ATTORNEY FOR DEBTOR: Craig G Margulies**    Craig@MarguliesFaithlaw.com,
Vicky@MarguliesFaithlaw.com;Helen@MarguliesFaithlaw.com;Angela@MarguliesFaithlaw.com
**ATTORNEY FOR U.S. TRUSTEE: Ron Maroko**    ron.maroko@usdoj.gov
**ATTORNEY FOR DEBTOR: Monserrat Morales**    Monsi@MarguliesFaithLaw.com,
Vicky@MarguliesFaithLaw.com;Helen@marguliesfaithlaw.com;Angela@MarguliesFaithlaw.com
**ATTORNEY FOR CREDITOR: Keith C Owens**    kowens@foxrothschild.com, khoang@foxrothschild.com
**ATTORNEY FOR CREDITOR: Jolene Tanner**    **jolene.tanner@usdoj.gov, USACAC.criminal@usdoj.gov**
**ATTORNEY FOR CREDITOR: Mark A Serlin**    ms@swllplaw.com, mor@swllplaw.com
**ATTORNEY FOR INTERESTED PARTY: Christopher C Todd**    chrisclydetodd@gmail.com, kellygreen62@gmail.com
**United States Trustee (LA)**    ustpregion16.la.ecf@usdoj.gov
**ATTORNEY FOR INTERESTED PARTY: Larry D Webb**    Webblaw@gmail.com, larry@webblaw.onmicrosoft.com
**ATTORNEY FOR INTERESTED PARTY: Christopher K.S. Wong**    christopher.wong@arentfox.com,
yvonne.li@arentfox.com

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                                                    **F 9013-3.1.PROOF.SERVICE**